# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CORALYNN E. WHITE,<br><br>    Plaintiff,<br><br>v.<br><br>JOSEPH JAMES FITZPATRICK, AMBER FITZPATRICK, THOMAS WUEST, MARK BERNDSEN, and CITY OF BREESE, ILLINOIS,<br><br>    Defendants. | Case No. 3:17-cv-00087-JPG-RJD |

## MEMORANDUM & ORDER

**J. PHIL GILBERT, DISTRICT JUDGE**

The police in Breese, Illinois arrested Coralynn White in 2015 following a domestic violence incident. Following her acquittal on the corresponding charges, she brought an action in this Court alleging numerous violations of her civil rights stemming from the arrest and subsequent prosecution. Now, this matter comes before the Court on the motion for summary judgment by defendants Thomas Wuest, Mark Berndsen, and the City of Breese, Illinois. (Doc. 59.) Defendants Joseph and Amber Fitzpatrick have joined in the motion for summary judgment without objection from any party. (Doc. 62.) For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** the defendants' motion for summary judgment.

## I.  BACKGROUND

Coralynn White and Joseph Fitzpatrick were formerly in a romantic relationship. The amended complaint and statement of disputed facts describe the tumultuous and sometimes violent history of this relationship in detail, but important point here is that the two have a child together over which they share custody. (Am. Compl. ¶¶ 12–17, Doc. 5.) One day in June 2015, White went to Joseph's home to pick up the child. (*Id.* at 19–22.) When she arrived, the couple

1

fought. (*Id.* at 22–30.) It is not clear who started this fight or how the fight progressed. What is clear is that Joseph's wife—Amber Fitzpatrick—was also at the house, ran next door with her children to get help from her neighbor—Jay Staser—and called 911. (Mot. for SJ. Ex. A, Doc. 60; Amber Fitzpatrick Dep. 50:16–54:2, Doc. 60-5; Doc. 60-7.) Amber told the police that White was threatening to kill Joseph with a knife. (*Id.*) So a member of the Breese Police Department—Officer Thomas Wuest—went to the house, where he found the "entire entrance to the home" and Joseph covered in blood. (Mot. for SJ. Ex. B, at p. 5, Doc. 60-1.) Joseph, along with neighbor Jay Staser, were pinning White to the floor. (*Id.*) Joseph was yelling "she stabbed me, she's crazy." (*Id.*)

Officer Wuest then called for backup and escorted White out of the house. (*Id.*) Clinton County deputies arrived to secure the scene, but Officer Wuest also called his sergeant—defendant Mark Berndsen—given the serious nature of the incident. (*Id.* at 6.) While emergency medical services (EMS) personnel were tending to White in the front yard, Officer Wuest returned inside to speak with Joseph and Staser. (*Id.* at 6–7.) Officer Wuest next returned outside, where he was met by Sgt. Berndsen. The sergeant then took over the investigation. (*Id.* at 6.) Sgt. Berndsen noted that when he arrived and saw White and the EMS personnel, it looked like White was covered in somebody else's blood given the fact that she was not actively bleeding herself. (*Id.* at 7.) Meanwhile, Joseph Fitzpatrick had multiple superficial wounds to his face, neck, chest, and arm areas, and he was bleeding through his bandages. (*Id.*)

At that point, the police did what any reasonable person would expect. They took photos of the evidence. (*Id.* at 17–43.) They collected a knife found at the scene. (*Id.* at 8.) They called the Clinton County State's Attorney to determine whether they needed to take Joseph Fitzpatrick's shirt into evidence. (Berndsen Dep. at 26:23–27:22, Doc. 60-8.) They took White to

the station for further interrogation, where she denied having a knife and stabbing Joseph. (Mot. for SJ. Ex. B, at p. 8, Doc. 60-1.) And finally, after that interview with White, Sgt. Berndsen completed a "statement of probable cause" and forwarded it to the State's Attorney. (Mot. for SJ. Ex. C, Doc. 60-2.) The State's Attorney charged White with three counts of felony battery and aggravated domestic battery (Mot. for SJ. Ex. D, Doc. 60-3), and later, a judge in the county found probable cause existed and allowed the case to proceed. But after a trial in November 2016, a jury found White not guilty on all charges.

In this Court, Coralynn White has brought a nine-count complaint against five remaining defendants: Joseph & Amber Fitzpatrick, Officer Wuest, Sgt. Berndsen, and the City of Breese, Illinois. The first two counts are 42 U.S.C. § 1983 claims against the individuals. The third is a 42 U.S.C. § 1983 claim against the City of Breese. The other six are a collection of state common-law false arrest, malicious prosecution, and abuse of process claims. Specifically, White believes that the defendants were "acting in concern pursuant to a common scheme and purpose of charging [White]" with the three felony counts.

In furtherance of her theory—which the defendants brand as "cockamamie"—White cites only to circumstantial evidence: that the Fitzpatricks are employed at the federal prison in Greenville, Illinois (and, according to White's theory, must be conspiratorially connected to all law enforcement officers in the county) (Am. Compl. ¶ 27, Doc. 5); Joseph Fitzpatrick and Jay Staser are friends with the police officers (Am. Compl. ¶ 28, Doc. 5.); Jay Staser is "best friends" with Officer Wuest (*Id.*); Amber Fitzpatrick previously worked for the Clinton County Sheriff's Office and knew Sgt. Berndsen to some unspecified degree (Pl.'s Resp. ¶ 7, Doc. 76); Jay Staser was a member of the volunteer fire department with Officer Wuest (*Id.* at ¶ 8); Officer Wuest knew Joseph Fitzpatrick from previous domestic incidents and because their children "attend the

same school" (*Id.* at ¶ 9); and a cluster of other bizarre allegations. The record has debunked a number of White's assertions, and the defendants have moved for summary judgment on all counts for a plethora of reasons.

## II. LEGAL STANDARDS

### i. *Summary Judgment*

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). If the moving party bears the burden of persuasion on an issue at trial, it must "lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. National Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *accord Felix v. Wisconsin Dep't of Transp.*, 828 F.3d 560, 570 (7th Cir. 2016). Where the moving party fails to meet that strict burden, the Court cannot enter summary judgment for that party even if the opposing party fails to present relevant evidence in response. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a motion for summary judgment, the nonmoving party may not simply rest upon the allegations contained in the pleadings, but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322–26; *Anderson*, 477 U.S. at 256–57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts". *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

### ii. *42 U.S.C. § 1983*

In order to prove a § 1983 claim against a police officer, a plaintiff must show that the officer (1) deprived the plaintiff of rights secured by the Constitution or laws of the United States, and (2) that the defendant was acting under color of state law. *Ienco v. City of Chicago*, 286 F.3d 994, 997-98 (7th Cir. 2002); *see Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *McKinney v. Duplain*, 463 F.3d 679, 683 -84 (7th Cir. 2006); *Brokaw v. Mercer Co.*, 235 F.3d 1000, 1009 (7th Cir. 2000). A plaintiff can also bring a § 1983 claim against a private party if the plaintiff shows that the private party "conspired or acted in concert with state officials to deprive [the plaintiff] of his civil rights." *Case v. Milewski*, 327 F.3d 564, 567 (7th Cir. 2003) (citing *Adickes v. S.H. Kress and Company*, 398 U.S. 144, 152 (1970)).

Additionally, a municipality can be liable under § 1983 if (1) the municipality had an express policy calling for constitutional violations; (2) it had a widespread practice of constitutional violations that was so permanent and well settled as to constitute a custom or usage with the force of law; or (3) if a person with final policymaking authority for the county

5

caused the constitutional violation. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978); *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). A municipality is liable only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," is the moving force behind the constitutional violation. *Monell*, 436 U.S. at 694.

## III. ANALYSIS

The defendants have moved for summary judgment on all counts for quite a few reasons: the existence of probable cause for the arrest bars the claims; qualified immunity protects the officers; there is a downright lack of evidence of any conspiracy here; and much more. White has responded, and has also submitted a fifteen-page "statement of disputed facts" in support of her response. While such a document may often demonstrate that there is a genuine dispute of material fact in a case—therefore precluding summary judgment—her statement of disputed facts here does not have such an effect. Rather, the document is littered with (1) facts that are not in dispute; (2) allegations that provide no evidence of a conspiracy between the defendants; and (3) puzzling statements by an expert witness—a professor of criminal law—telling the Court that there was no probable cause to arrest White in this case. Unfortunately for White, she has only rested upon allegations in the pleadings, and the evidentiary record here is "so one-sided" that it rules out any prospect of a finding in her favor—even when construing the evidence in the light most favorable to her. *Hotel 71 Mezz Lender LLC*, 778 F.3d at 601.

### i. *Count I*

Count I of the amended complaint alleges that the Fitzpatricks, Officer Wuest, and Sgt. Berndsen acted in concert to violate White's Fourth Amendment rights via the Fourteenth Amendment's due process clause, which incorporated the Fourth Amendment against the states.

6

The Fourth Amendment protects individuals against unreasonable seizures. U.S. CONST. amend. IV. White's legal theory here is scattershot—and the Fourth Amendment does not apply to a lot of it—but her central theme is that the Fitzpatricks and law enforcement conspired and "falsely arrested, imprisoned, and prosecuted [her] without probable cause." (Am. Compl. ¶ 68, Doc. 5.) White's premise appears to be based on her claim that Officer Wuest purposefully escorted White from the blood-soaked home in order to allow Joseph and Staser to plant a knife, framing White for the incident. White also believes that Sgt. Berndsen violated proper police practices by not taking Joseph's shirt into evidence, although it is not clear how this has any bearing on a Fourth Amendment analysis. (*See* Am. Compl. ¶¶ 54 & 56, Doc. 5.)

Generally, it is a bad idea to mock an opposing counsel's argument as "cockamamie", as the defendants have done in their motion for summary judgment. *See, e.g., Bennett v. State Farm Mut. Auto. Ins. Co.,* 731 F.3d 584, 585 (6th Cir. 2013) ("[t]he reasons include civility; the near-certainty that overstatement will only push the reader away . . . and that, even where the record supports an extreme modifier, the better practice is usually to lay out the facts and let the court reach its own conclusions.") (internal citation and quotations omitted). But here, the use of the word may be warranted because there is zero evidence of a conspiracy between the Fitzpatricks, Officer Wuest, and Sgt. Berndsen to violate White's Fourth Amendment rights.

This is what we know: there was a bloody incident of domestic violence at Joseph's home between Joseph and White. This is not the first time the two have been involved in a fight. We do not know who started this fight. And we do not know if Joseph or Staser planted a knife to frame White while Officer Wuest separated her from the violent scene. But none of that matters in this case. Here, the only thing that matters is whether the Fitzpatricks are liable under

Section 1983 by acting in concert or conspiring with the officers to deprive White of her rights under color of state law. *Case*, 327 F.3d at 567.

White has pointed to no evidence that would implicate Officer Wuest and Sgt. Berndsen in a conspiracy. Instead, she has pointed to vague allegations that some of the defendants knew each other through activities like the volunteer fire department, or that the Fitzpatricks are prison guards, meaning the police officers simply must be working in concert with them. Berndsen and Wuest both testified at their depositions that they only knew Joseph Fitzpatrick because of prior domestic violence investigations—at least one of which led to Joseph's arrest. (Berndsen Dep. 65:15–66:5, Doc. 60-8; Wuest Dep. 83:9–24; Doc. 60-7.) Moreover, both Officer Wuest's and Jay Staser's testimony directly contradicts White's allegation in the amended complaint that Officer Wuest and Jay Staser were "best friends". (Am. Compl. ¶ 28, Doc. 5.) Staser said he "just knew him from being on the volunteer fire department, and we both coach t-ball. That was pretty much the scope of it." (Staser Dep. 28:14–16, Doc. 60-6.) Both Officer Wuest and Staser indicated that Staser's role with the volunteer fire department ended around 2006, and neither party ever referred to the other person as a "friend"—let alone a "best friend," as White claims. (*Id.* at 29:11–14; Wuest Dep. 15:14–21; Doc. 60-7.) Since the record is devoid of evidence that Joseph and Amber Fitzpatrick acted in concert with the police to frame White and violate her rights, the Fitzpatricks are not liable under Section 1983 and the Court will grant summary judgment in favor of them on this count.

Moreover, Count I fails in respect to the claims against Officer Wuest and Sgt. Berndsen for a critical reason: they had probable cause to arrest White. The existence of probable cause "is an absolute defense to a claim of wrongful arrest asserted under section 1983 against police

officers." *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008). Probable cause is determined by considering the totality of the circumstances:

> [A] law enforcement officer has probable cause to make an arrest when the facts and circumstances within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense. . . . Probable cause, however, does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime. . . . So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists.

*United States v. Sawyer*, 224 F.3d 675, 678–79 (7th Cir. 2000) (internal citations omitted). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152.

Here, Officer Wuest and Sgt. Berndsen undisputedly had probable cause to detain and arrest White. First, Amber Fitzpatrick called 911 to report that White had a knife and was going to kill Joseph. This call surely raised red flags to the police given the history of domestic violence here. Next, when the officers arrived, both Joseph and the entrance to the home were covered in blood. So the officers did what any reasonable officers would do: separate the individuals, question them, collect and photograph evidence, and take the primary suspect—White—into the station for questioning. Sgt. Berndsen then completed the statement of probable cause, which he forwarded to the Clinton County State's Attorney. That office also thought that the case against White had merit, as they brought felony charges against her.

White objects. She believes that probable cause did not exist because the officers acted in bad faith by (1) "failing to secure the alleged crime scene" through leaving Joseph Fitzpatrick and Staser inside the home while Officer Wuest escorted White outside; (2) failing to take

9

Joseph Fitzpatrick's shirt into evidence; (3) failing to consider the disparity in size between White and Joseph Fitzpatrick; (4) failing to consider the absence of blood and fingerprints on the knife; and more. But even if White's theories are true, none of it matters for the probable cause inquiry. Police officers "have no constitutional obligation to conduct any further investigation before making an arrest if they have received information from a reasonably credible victim or eyewitness sufficient to supply probable cause . . . even if sound police technique would have required such further investigation." *Woods v. City of Chicago*, 234 F.3d 979, 997 (7th Cir. 2000); *see also Reynolds v. Jamison,* 488 F.3d 756, 766 (7th Cir. 2007) ("once [the officer] reasonably believed that [the plaintiff] had committed a crime, he had probable cause and was under no duty to investigate further."). Moreover, the Court is puzzled why White hired an expert witness to testify that the aforementioned factors show that "probable cause did not exist for the criminal charges filed against Coralynn [White]." (Pl.'s Resp. ¶ 63, Doc. 76.) The existence of probable cause is not an issue for an expert to decide. It is an issue for the Court to decide.

And even though the probable cause standard allows for reasonable mistakes by an officer, there is another doctrine that adds further protection for the officers here: qualified immunity. This type of immunity is an affirmative defense that protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017). When working in tandem with probable cause, qualified immunity "affords an added layer of protection by shielding officers from suit for damages if a reasonable officer could have believed [the arrest] to be lawful, in light of clearly

10

established law and the information the [arresting] officers possessed." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) (internal citation and quotation marks omitted). Here, the officers surely had reason to believe that arresting White was lawful in light of the information they possessed: a frantic 911 call, a history of domestic violence between the couple, a blood-soaked foyer and individual, and a pinned White. While a jury may have later found White not guilty, that is completely irrelevant to the probable cause inquiry. Accordingly, the Court will also grant Officer Wuest and Sgt. Berndsen summary judgment on Count I.

### ii. *Count II*

Count II fails for a lot of the same reasons as Count I. It alleges that the same defendants—the Fitzpatricks, Officer Wuest, and Sgt. Berndsen—deprived White of her Fifth Amendment rights through the Fourteenth Amendment's due process clause. White's specific theory here is unclear. She claims in the amended complaint that the defendants denied her "**substantive** due process of law in that there were no reasonable grounds for Wuest and Berndsen to reasonably believe that [White] had committed the criminal offenses of felony battery or felony aggravated domestic battery." (Compl. 74.) But in her response brief, White argues that she is pursuing a fabrication of evidence claim, which is not an issue of substantive due process.

Regardless, her theory appears to be that Officer Wuest and Sgt. Berndsen provided Joseph Fitzpatrick and Jay Staser with an opportunity to plant the knife—which is allegedly "fabricated evidence". But again, even if Fitzpatrick and Staser planted the knife, there is zero evidence that Officer Wuest and Sgt. Berndsen acted in concert with them to do so. Wuest escorted White outside the house to remove her from the bloody scene, handcuff her, and allow

EMS personnel to treat her—as any reasonable officer would do—and there is no reason to believe that he did so in order to aid Fitzpatrick and Staser in fabricating evidence.

White's other theory is that Officer Wuest and Sgt. Berndsen hid exculpatory evidence by failing to take Joseph's bloody shirt into evidence. White complains that if she really did stab Joseph, then the knife would have gone through his shirt to inflict a wound. (Pl.'s Resp. ¶ 54, Doc. 76.) But since the police did not take the shirt into evidence—and since the Fitzpatricks later allegedly destroyed the shirt—she believes the police deprived her of her Fifth Amendment right to analyze potentially exculpatory evidence. This argument appears to stem from the rule in *Brady vs. Maryland*, 373 U.S. 83 (1963), which states that the Government has a duty to turn over exculpatory evidence. Although *Brady* does not apply on its face to these facts, the Seventh Circuit has recently stated that "[t]hough Brady did not announce a duty to preserve evidence, a duty to refrain from bad-faith destruction flows necessarily, and obviously, from its familiar holding that suppression of material exculpatory evidence violates due process." *Armstrong v. Daily*, 786 F.3d 529, 550 (7th Cir. 2015) (emphasis added).

White relies on the "bad-faith destruction" language in *Armstrong*, and we are back to square one. There is *no* evidence in this case that the officers acted in bad faith. There is *no* evidence that the officers conspired with the Fitzpatricks or Staser to plant or destroy evidence. There is evidence—in White's own statement of facts—that "Berndsen stated that he planned to take the shirt into evidence, but telephoned the State's Attorney to ask for his opinion; and the State's Attorney, John Hudspeth, stated that he did not want the shirt taken into evidence." (Pl.'s Resp. ¶ 27, Doc. 76.) While this should have been the end of White's theory, she instead reads into the facts by arguing:

> Berndsen's alleged call to the State's Attorney to inquire whether
> he should take the shirt into evidence is more than curious. It raises

> additional doubts about his objectivity which, in view of his statement that he did not believe Coralynn and did not think anyone else would believe her, was already in substantial doubt.

The Court is bewildered how Berndsen's call is "more than curious" and "raises additional doubts about his objectivity." Instead, it shows a law enforcement officer calling in to see whether it is necessary to take a certain item at the crime scene into evidence. What *would* be more than curious is if Berndsen did something like toss the shirt into a burning fire, which he did not. White has utterly failed to bear her burden of persuasion on this issue. Accordingly, the Court will grant summary judgment in favor of all defendants on Count II.

### iii. *Count III*

Count III is a Section 1983 claim against the City of Breese pursuant to the Fourth, Fifth, and Fifteenth Amendments. White has alleged that the city had a custom, policy, or practice of denying due process to individuals accused of a crime when the alleged victim had a friendly relationship with the police. White claims that the city thus "tolerated, condoned, and permitted cronyism in the investigation and prosecution of alleged criminal activity." (Am. Compl. ¶ 78, Doc. 5.) White also alleges that the city's hiring and training practices are deficient.

White has introduced zero evidence or argument in favor of any of these allegations. In her response to the motion for summary judgment, she simply states that "[i]ssues of fact exist precluding Summary Judgment in favor of the City of Breese"—without explaining what any of these issues of fact are. (Pl.'s Resp. 11, Doc. 69). She has cited to several cases on the matter— for example, *City of Canton vs. Harris*, 489 U.S. 378, 395 (1989), which held that a municipality's "policy of inaction" is sometimes the functional equivalent of a city deciding to affirmatively violate the Constitution—but White makes no effort to either compare these cases

to hers or show that the City of Breese has engaged in any repeated "policy of inaction". The Court will grant summary judgment for the City of Breese, Illinois on Count III.

### iv.    *Counts IV–IX*

Finally, Counts IV–IX all allege violations of the common law, which amount to Illinois state crimes:

- **Count IV:** Common law malicious prosecution against the Fitzpatricks, Wuest, and Berndsen;
- **Count V:** Common law false arrest against the Fitzpatricks, Wuest, and Berndsen;
- **Count VI:** Common law abuse of process against the Fitzpatricks, Wuest, and Berndsen;
- **Count VII:** Common law malicious prosecution against the City of Breese, Illinois;
- **Count VIII:** Common law false arrest against the City of Breese, Illinois;
- **Count IX:** Common law abuse of process against the City of Breese, Illinois

White invokes the Court's supplemental jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1367.

Like the Section 1983 claims, White's state law false arrest claims turn on whether the officers had probable cause to arrest her. "The essential elements of a cause of action for false arrest or false imprisonment are that the plaintiff was restrained or arrested by the defendant, and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff." *Meerbrey v. Marshall Field & Co.*, 139 Ill.2d 455, 151 Ill.Dec. 560, 564 N.E.2d 1222, 1231 (1990). As noted above, the officers had reasonable grounds to believe that White had committed an offense. For that reason, the Court will grant summary judgment in the defendants' favor on Counts V and VIII and need not consider whether the officers enjoy qualify immunity on these claims.

The malicious prosecution and abuse of process claims present a different scenario. The Court had at the time of removal, and continues to have, jurisdiction over these remaining claims under 28 U.S.C. § 1367(a). That statute extends supplemental federal jurisdiction to all claims

14

that are sufficiently related to the claims on which original jurisdiction is based so as to be part of the same case or controversy. But § 1367(c)(3), however, provides that a district court "may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." A district court has broad discretion in deciding whether to decline jurisdiction over state law claims when no original jurisdiction claims remain pending. *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012). The district court should consider judicial economy, convenience, fairness and comity when deciding whether to exercise this discretion. *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "[W]hen the district court dismisses all federal claims before trial, the usual and preferred course is to remand the state claims to the state court unless there are countervailing considerations." *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1043 (7th Cir. 1998) (citing *Wright*, 29 F.3d at 1251). This is true even when the decision is on the eve of trial so long as the district court has not made a "substantial investment" of time in the litigating untried claims. *RWJ Mgmt.*, 672 F.3d at 478.

The Court has considered the relevant factors and declines to exercise supplemental jurisdiction over Counts IV, VI, VII, and IX in this case. The Court firmly believes that Illinois state courts are far better equipped to hear cases that turn on the interpretation and application of state law between citizens of Illinois. As a matter of comity and efficiency, the privilege of hearing such cases should rest with the state court system. Furthermore, it would be no less convenient for the plaintiff to proceed in state court than in federal court, and the Court sees no unfairness that would result from litigation in a state forum. Finally, the Court notes that it has not made a substantial investment of time in resolving the state law claims: the vast majority of its efforts have focused on the federal question claims. Thus, the presumption to relinquish

jurisdiction has not been overcome. For these reasons, the Court declines to exercise jurisdiction over the remaining claims in this case and will dismiss those claims without prejudice for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the foregoing reasons, the Court:

- **GRANTS IN PART and DENIES IN PART** the defendants' motion for summary judgment (Doc. 59);

- **DISMISSES WITH PREJUDICE** Counts I, II, III, V, and XIII of the amended complaint;

- **DISMISSES WITHOUT PREJUDICE** Counts IV, VI, VII, and IX of the amended complaint for lack of jurisdiction; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED: FEBRUARY 27, 2018**

                *s/ J. Phil Gilbert*
                **J. PHIL GILBERT**
                **DISTRICT JUDGE**